[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM ORDER
The defendant, Dennis P. McDonough's Motion for Summary Judgment on the Third Count is hereby DENIED for the following reasons: CT Page 6427
1. In this case, plaintiff Connecticut Attorneys Title Insurance Company ("CATIC"), a Connecticut corporation engaged in the title insurance business, seeks indemnification from defendant Dennis P. McDonough, a Connecticut attorney whom it once authorized to issue title insurance policies on its behalf, for a payment it made to the Norwalk Savings Society on a claim under a CATIC title insurance policy which was allegedly issued due to the negligence of the defendant.
2. The defendant issued the policy in question on July 16, 1996 to insure the title to a certain parcel of real property in West Redding, Connecticut which had been put up by its putative fee simple owner, one Gerard Sebban, to secure a $175,000 mortgage loan from the bank. In particular, the policy purported to guarantee that Mr. Sebban was, as he had represented, the sole and exclusive owner of the entire property, and thus that the bank's mortgage on the property would be a valid and enforceable lien against the entire fee title thereto.
3. In fact, Mr. Sebban's only ownership interest in the mortgaged property was an undivided one-half interest therein, with his wife, who did not join him in the mortgage, owning the remainder. This fact was not discovered by the bank until April of 1989, when the property was foreclosed on by a second mortgagee. Thus, when the second mortgagee took title to the property subject to the bank's first mortgage and sold it for $175,000, the bank received only $87,500, representing one-half of the total proceeds of the sale.
4. In light of these events, the bank made a claim against the plaintiff under the subject title insurance policy, seeking reimbursement for the additional $87,500 it would have received from the sale of the property had Mr. Sebban owned all of it, as the policy had guaranteed. On November 13, 1991, the plaintiff paid the bank's claim in its entirety without requiring it to file a civil suit.
5. Against this background, the plaintiff commenced the instant action on October 13, 1993. In the third count of its pending complaint, the plaintiff seeks indemnification from the defendant on grounds of negligence, alleging: first, that its obligation to pay the bank's claim arose under a title insurance policy which was issued by the defendant; second, that before issuing said policy, the defendant was obliged, as its agent, to verify the prospective mortgagor's representation that he was the CT Page 6428 sole and exclusive owner of the subject property; third, that the defendant's failure to ascertain the true nature and extent of Gerard Sebban's ownership interest in the property prior to issuing the subject insurance policy constituted negligence; fourth, that as the issuer of the policy, the defendant was in total control of the situation to the exclusion of the plaintiff; and fifth, that the plaintiff had no reason to know of the defendant's negligence, had no reason to anticipate such negligence, and could reasonably rely upon the defendant not to be negligent in performing his duties as its agent for the issuance of title insurance policies.
6. The defendant now moves this Court for summary judgment on the plaintiff's claim for indemnification, contending that that claim is barred by the two-year statute of limitations set forth in General Statutes § 52-584b. Section 52-584b provides as follows:
 Notwithstanding any provision of the general statutes, no action, whether in contract, tort or otherwise, against an attorney to recover for injury caused by negligence or by reckless or wanton misconduct in the preparation of and the execution and delivery of an attorney's title certificate or opinion or the title search in connection therewith, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, except that no such action may be brought more than ten years from the date of such delivery.
In this case, argues the defendant, the plaintiff's claim is governed by Section 52-584b because it seeks damages from an attorney for alleged negligence in the performance of a title search. Here, then, claims the defendant, this action is untimely since it was not commenced until October 1993, almost four and one-half years after his alleged negligence in the issuance of the subject insurance policy was first discovered.
7. The plaintiff disagrees with the defendant's argument for several reasons which this Court finds persuasive. Initially, it contends that Section 52-584b does not apply to the instant action because, though it is based on the defendant's alleged CT Page 6429 negligence in the performance of a title search, the title search in question was not performed "in connection [ ]with" the preparation, execution and/or delivery of an "attorney's title certificate or opinion." Id. Attorney's title certificates or opinions are prepared by attorneys for their clients before the clients enter into contracts to purchase real property. The obvious purpose for preparing such a certificate or opinion is to assure one's client that if the property is purchased, his title to it will be free and clear of all encumbrances, and thus that his light to use and enjoy it will not be interfered with.
In this case, by contrast, the title search in question was not performed by an attorney for his client, but by a licensed title insurance agent for his principal, a title insurance company. Though the defendant was also a licensed attorney, he was not employed by the plaintiff in that capacity and did no work for the plaintiff as such, including, importantly, the preparation, execution and/or delivery of an attorney's title certificate or opinion.
8. Connecticut has long recognized that "the examination of titles and the determination of their validity is highly technical and often demands the entire time and study of a specialist. An error committed may result in great financial loss." Grievance Committee of the Bar of New Haven County v.Payne, 128 Conn. 325, 329 (1941). Accordingly, our Supreme Court has held that "the giving of certificates as to the validity of land titles, carried on as a regular business, is the practice of law [.]" Id., 330.
In reaching that conclusion, however, the Payne Court carefully distinguished between the issuance of such a certificate or opinion and the mere review of land records and reporting of what they disclose "`without giving opinion or advice as to the legal effect of what is found.'" Id., 331 (quoting Opinion of the Justices, 289 Mass. 607, 615). Though the latter, which requires no special legal skill or expertise, can lawfully be performed by anyone, without limitation or penalty, the former, which requires such skill and expertise, can only be performed by a licensed attorney, who is presumptively "`possessed of adequate learning and skill, of sound moral character, and acting at all times under the heavy trust obligation to clients which rests upon all attorneys.'" Id.
(quoting again from Opinion of the Justices, supra, 614). CT Page 6430
9. Against this background, it is of no small significance that Connecticut has long permitted non-attorneys to serve as title agents even though an essential part of their function is the performance of title searches. Implicit in the extension of such permission, which continues to this day, is the acknowledgment that performance of a title search in connection with the issuance of a title insurance policy does not constitute the practice of law, and thus is not the legal equivalent of performing a title search in connection with the issuance of an attorney's title certificate or opinion.
Up to June 12, 1984, any person could become a licensed title insurance agent if he applied in writing for such a license to the State Insurance Commissioner, paid the statutory filing fee, produced a written statement of a title insurance company authorized to do business in Connecticut that that company intended to appoint him, if he was licensed, as its agent, furnished satisfactory evidence that he was of good moral character and was financially responsible, and demonstrated, in a suitable examination, that he was knowledgeable about insurance and insurance law and was competent to perform the duties of a title insurance agent. Conn. Gen. Stat. § 38-72 (as amended through October 1, 1983). Though some persons who applied for and received title insurance licenses in that time frame were licensed Connecticut attorneys, many others were not.
On June 12, 1984, however, with the passage of Public Act 84-403, the General Assembly decided that from that date forward, all new applicants for Connecticut title insurance licenses must be commissioners of the superior court in good standing unless
they held valid title insurance licenses prior to the effective date of the new law. Though the new licensing requirement may well have been adopted to further professionalize the ranks of Connecticut title insurance agents, it was certainly not adopted to declare and acknowledge that the carrying on of the title insurance business constituted the practice of law. Had that been the case, the General Assembly would undoubtedly have so noted in debating the new requirement. Significantly, they did not.
More importantly, such a purpose does not square with the enactment of the grandfather clause, whereby previously licensed, non-attorney title agents were permitted to continue in the title insurance business under their pre-June 12, 1984 insurance licenses. CT Page 6431
10. In 1990, by the passage of the Connecticut Title Insurance Act ("CTIA"), General Statutes § 38a-400 et seq.,
the General Assembly confirmed the foregoing analysis by formally acknowledging two related facts: first, that an essential responsibility of every licensed Connecticut title insurance agent is the conduct of title searches; and yet second, that no licensed title agent is understood to be engaging in the practice of law.
The CTIA was enacted "to provide the state . . . with a comprehensive body of law for the effective regulation and supervision of title insurance business transacted within the state [.]" Conn. Gen. Stat. § 38a-400(b). As such, it "appl[ies] to all title insurers, title insurance rating organizations, title agents applicants for title insurance, title insurance policy holders and all other persons engaged in title insurance transactions in this state." Conn. Gen. Stat. §38a-401(a). The Act defines the "title insurance business" as follows:
 (A) issuing as insurer or offering to issue an insurer a title insurance policy or (B) transacting or proposing to transact by a title insurer or title agent any of the following activities when conducted or performed in contemplation of the issuance of a title insurance policy: (i) Soliciting or negotiating the issuance of a title insurance policy; (ii) guaranteeing, warranting, or otherwise insuring the correctness of title searches; (iii) execution of title insurance policies; (iv) effecting contracts of reinsurance or (v) doing or proposing to do any business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of Sections 38a-400 to 38a-425, inclusive.
Conn. Gen. Stat. § 38a-402(14) (Emphasis added). It then defines a "title insurer" as "a company organized under the laws of this state for the purpose of transacting as insurer the business of title insurance. . . ." Conn. Gen. Stat. § 38-402(16), and a "title agent" as "any person authorized in writing by a title insurer to (A) solicit title insurance business, (B) collect premiums, (C) determine the insurability CT Page 6432 of a risk in accordance with underwriting rules and standards prescribed by the title insurer, (D) issue policies of the title insurer." Conn. Gen. Stat. § 38a-402(13).
On the particular subject here at issue — whether performance of a title search in connection with the issuance of a title insurance policy is the legal equivalent of performing a title search in connection with the issuance of an attorney's title certificate or opinion — the CTIA contains two especially relevant provisions. The first, Section 38a-407, explicitly provides that, "No new title insurance policy may be written unless and until the title insurer or its title agent has caused to be conducted a reasonable search and examination of the title and has caused to be made a determination of insurability of title in accordance with sound underwriting practices." This statute expressly authorizes title agents, who may be non-attorneys if they received their licenses prior to June 12, 1984, to conduct title searches in connection with the issuance of title insurance policies.
The second, General Statutes § 38a-401(c), provides that, "Nothing in this act shall be construed to authorize the practice of law by any person who is not duly admitted to the practice of law in this state nor shall it be construed to authorize the [insurance] commissioner to regulate the practice of law." This provision states explicitly what has already been demonstrated by inference: that none of the acts required by statute of title agents, including the performance of title searches in connection with the issuance of title insurance policies, involves or constitutes the practice of law.
In conclusion, since the performance of a title search in connection with the issuance of a title insurance policy is not the legal equivalent of the performance of such a search in connection with the issuance of an attorney's title certificate or opinion, the former, unlike the latter, is not governed by General Statutes § 52-584b.[1]
11. The plaintiff further argues that this action is governed by General Statutes § 52-598a, which provides as follows:
 Notwithstanding any provision of this chapter, an action for indemnification may be brought within three years from the date of determination of the action against the party CT Page 6433 which is seeking indemnification by either judgment or settlement.
Under that statute, claims the plaintiff, this action was timely filed because it was brought less than two years after the underlying claim for which it now seeks indemnification was fully paid, and thereby "settled." The plaintiff contends that its pre-suit payment of that claim constituted "the determination . . . by . . . settlement" of an "action against [it]," within the meaning of the statute. On that score, it argues that even though the claim in question was never made the subject of a formal legal "action," it would certainly have been litigated if it had not been paid, and its payment extinguished the claimant's right of action against it.
The defendant disagrees with the plaintiff's analysis, contending principally that the statute cannot apply to this case because the term "action," as used in this statute, means only a formal legal action which is duly commenced by the service of process and returned to court, whereas here, on the claim for which indemnification is sought, no such action was ever brought, much less "determined] . . . by judgment or settlement." Here, then, argues the defendant, the timeliness of the instant action is necessarily governed by the rule of Protter v. Brown Thompson Co., 25 Conn. App. 366, cert. granted, 220 Conn. 910 (1991), appeal withdrawn (1992), wherein the Appellate Court held that in Connecticut, an indemnification action must be commenced within the time allowed by law for bringing a direct action on the underlying claim for which indemnification is sought. Therefore, concludes the defendant, since the underlying claim sounds in negligence, and the statute of limitations for negligence actions, General Statutes § 52-584, disallows the commencement of any such action later than "three years from the date of the act or omission complained of," id., this action should have been commenced not later than three years after April 13, 1986, when the bank's title insurance policy was issued. The failure to do so, asserts the defendant, requires the granting of its motion for summary judgment.
12. The Court agrees with the plaintiff that the instant action is indeed governed by General Statutes § 52-598a even though the bank's underlying claim against the plaintiff never became the subject of a formal legal action. It does so for the following reasons: CT Page 6434
First, though the term "action," as used in the statute, might well be understood to mean a formal legal action, as the defendant has argued, the event identified in the statute which starts the running of the limitations period prescribed therein is not the commencement of such an action, but the "determination of the action . . . by either judgment or settlement." Id. The analytical question thus presented for decision is whether an "action" can be "determin[ed] . . . by . . . settlement," within the meaning of the statute, before it is formally commenced.
This inquiry depends, naturally enough, on the meanings of the words used in the statute. If those words have meanings that are plain and unambiguous, the statute must be enforced, without further analysis, according to those meanings.
The term "settlement," to be sure, is frequently used in the litigation context to describe an agreement to resolve a pending legal action, typically by withdrawing the action in exchange for payment or for other valuable consideration. The term "judgment," with which it is paired in the statute, invariably means judgment in a formal legal action, for judgments can only be entered by courts, and courts lack jurisdiction to enter judgments without the requisite legal formalities of service of process and return of process to court.
The term "settlement," however, has long and appropriately been used to describe the final resolution of a legal controversy which has not yet become formal legal action. Of particular interest and significance for this case, the term has been used to describe the pre-suit payment of insurance claims and of demands for damages on which later actions for restitution against primarily responsible parties are sought to be based.
Thus in Aetna Casualty Surety Co. v. Murphy, 206 Conn. 409,417 (1988), (quoting 8 J. Appleman, Insurance Law and Practice (Rev. Ed. 1981) § 4731, pp. 2-5, the Supreme Court explained as follows the mandatory requirement in most insurance policies that the claimant give timely notice of his claim to the insurer:
 The purpose of a policy provision requiring the insured give the company prompt notice of an accident or claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances. . . . And further, if the insurer is thus given the CT Page 6435 opportunity for a timely investigation, reasonable compromises and settlements may be made, thereby avoiding prolonged and unnecessary litigation."
So stating, the Court expressly acknowledged that the making of a claim against an insurer is not only a request to honor a contractual obligation, but also a necessary first step in the process of finally resolving legal rights through litigation. The payment of such a claim prior to suit terminates forever any right to pursue litigation based upon it, and thus is no less a settlement of a legal action than a post-filing "settlements of the same exact claim. Plainly, it is the policy of the law, as expressed by the rule of timely notice, to encourage the pre-suit "settlement" of coverage claims, whenever possible.
Similar policy concerns were voiced by the Supreme Court over a century ago in Smith v. Foran, 43 Conn. 244 (1975), where the Supreme Court used the term "settlement" to describe the out-of-court payment of a damages claim that had been presented to the plaintiff outside of court, without any legal action being filed. There, the plaintiff was a piano mover who had contracted with a third party to move a piano, and the defendant was the plaintiff's employee, who had negligently damaged the piano during the move. Shortly after the piano was damaged, the third party demanded payment of his damages from the plaintiff, who promptly paid him, "in full settlement" of his claim, without need for formal legal proceedings. Id., 245. The plaintiff then demanded restitution for its payment from the defendant, who refused to pay, claiming that no such restitution could be collected from him until there was a formal legal judgment against the plaintiff, compelling him to pay those damages to the third party. Upon the defendant's refusal to pay, the plaintiff brought suit.
In discussing the defendant's claim that he could owe the plaintiff no duty to pay restitution until a judgment for the amount in question was entered against the plaintiff, the Supreme Court first noted as follows that the plaintiff's liability to the piano owner was not wholly derivative of the defendant's liability:
 The plaintiffs, being common carriers, had a special property in the piano and could as such special owners maintain an action against CT Page 6436 the servant for an injury by the negligence to such special property. And, besides this, the plaintiffs, by reason of their undertaking as common carriers, were liable to the owner of the piano for its destruction or injury, even though it had been destroyed in the hands of the servant with no fault of his . . .. The liability of the plaintiffs stands upon its own ground, their implied contract to deliver the piano in good condition at its place of destination, in spite of all obstacles except those caused by the act of God or of a public enemy. And this liability rests upon no other ground where the delivery is prevented by the negligence of the servant. He is liable to them for his negligence, they to the owner for the non-performance of their undertaking.
Id., 250. So noting, the Court went on to observe that the plaintiff's pre-suit payment of his valid legal debt to the third party constituted such a "settlement" of the third party's claim as to entitle him to seek restitution for that payment just as if the amount of the payment had been finally determined by a court.
 [W]here, as here, the carrier fails to deliver the property solely because of its destruction or injury by his servant, the amount of damage to which the carrier is liable at the suit of the owner, is precisely the same as that to which the servant is liable at the suit of the carrier. And upon this fact the counsel for the defendant bases their claim that the plaintiffs should have first had their liability and the exact amount of it established in a suit at law before they could maintain a suit against the defendant. But the reason of the thing is wholly against the claim. In the first place, if the plaintiffs were liable to the owner of the piano, it is absurd to require the owner to bring a suit, and the plaintiffs to defend against it, and finally pay, after a judgment and with costs, what they were perfectly willing to pay at the outset, and what the judgment would show they were legally bound to pay. And in the next CT Page 6437 place, the judgment would not establish the liability of the defendant. That, as we have seen, would stand upon its own ground, and his negligence, on which alone his liability would rest, would not even enter into the suit against the plaintiffs as a matter for consideration. He could still, in the suit against him, deny the fact of his negligence, and could prove the amount of the damage. All this he could do if the plaintiffs had settled with the owner without suit. If in such settlement they had paid the owner more than the actual damages, such payment would not have bound the defendant. He would be liable to them only for the actual damage. If, however, he had settled with the owner for less than the real damage, they could recover of the defendant no more than the damages paid. The damage which the defendant is to pay is the actual damage to the plaintiffs. That of course can not be greater than the sum they have had to pay, though it may be less, if they have unnecessarily and of their own folly paid more than they were obliged to pay. They were bound to pay the actual damage done to the piano, and if they got off with paying less, then they were themselves damaged so much less, and could recover only such reduced sum from the defendant. Id., 250-51 (Emphasis added.) So stating in an action closely analogous to the instant action, the Smith Court expressly equated the pre-suit "settlement" of a valid legal claim with the final judgment in a lawsuit presenting that claim. As the Court well recognized, a pre-suit settlement finally resolves all aspects of a legal controversy just as surely and completely as any lawsuit that might ever be based upon it.
The foregoing interpretation, moreover, is fully consistent with the legislature's purpose for enacting the new statute, which was to abrogate the harsh rule of Protter v. Brown Thompson Co., supra, which the Appellate Court had recently decided. In Protter the Court had held that an indemnification action is barred by the statute of limitations if it is not brought within the same period of limitations that applies to an original action CT Page 6438 against the indemnitee on the underlying claim for which indemnification is sought. The practical effect of the Protter decision, as the Court itself acknowledged, was to deprive certain persons of their indemnification rights even before those rights accrued. Id., 365. This was true for the following reasons.
Under our law, "[i]ndemnity is the right which a person has who has been compelled to pay what another should be forced to pay in full." Lockwood v. Nagy Bros., Inc., 150 Conn. 691, 692
(1962). By this definition, the right to indemnify does not arise until "payment has been made under compulsion by the indemnitee[;]" 42 C.J.S., Indemnity § 45, p. 139; accord,Wolthausen v. Trimpert, 93 Conn. 260, 268-69 (1919) (holding that a would-be-indemnitee cannot maintain his action against an alleged indemnitor until he incurs — in that case by payment — an ascertainable loss); or at least until he has been placed, by judgment or settlement, under an unavoidable obligation to pay. McEvoy v. Waterbury, 92 Conn. 664, 667 (1918) (holding that a cause of action for indemnification did not accrue until final judgment against the indemnitee was entered).
When an action on a claim as to which the defendant has potential indemnification rights is brought well within the applicable period of limitations, that action may finally be determined, by judgment or settlement, before the limitations period expires. In that event, the defendant's indemnification rights, if any, will accrue before the period for filing an indemnification action expires, and the defendant can await final judgment or settlement to determine if that is necessary.
When, however, any action on a claim as to which indemnification rights may one day accrue is brought at or near the end of the statutory period of limitations, such rights will almost certainly not accrue before the limitations period expires, for it is doubtful that the case will settle or go to judgment by that time. In that event, though the defendant may have little or no time to discover who may be liable to indemnify him for any damages he may ultimately be required to pay, he must file his indemnification claim before the limitations period expires or he will lose it forever under Protter.
In the best of circumstances, the strict enforcement ofProtter would put enormous pressure on defendants to frame and file claims for indemnification before the limitations period CT Page 6439 expired. In response to this pressure, defendants would doubtless burden the courts with large numbers of hastily prepared, ill-thought-out pleadings just to "get in under the deadline." As a result, many defendants, despite their best last-minute efforts, would doubtless lose all or part of their indemnification rights through understandable oversight and inadvertence in preparing and presenting their claims.
In the worst of circumstances, of course, there would be inadequate time to research, investigate, develop, frame or file any claim for indemnification, however ill-prepared or incomplete. In those circumstances, the defendant would obviously suffer the wholesale forfeiture of his indemnification rights through no fault of his own.
Mindful of these unjust, unfair results to which the Protter
decision would inexorably lead, the legislature sought, by enacting the new statute, to reverse that decision, and thus to ensure that each person who had potential indemnification rights against a third person would have a reasonable opportunity to assert those rights after the need to assert them arose. The public act by which the new statute was made law was thus entitled, "An Act Concerning the Statute of Limitations in Actions for Indemnification." Public Act 93-370. The use of this title signified an intent by the legislature to have the new law apply broadly to all indemnification actions, regardless of the circumstances under which they arose.
In his commentary on the bill, moreover, Representative Richard Tulisano, the legislator who introduced it, pointedly stated that the purpose of the bill was to clarify current law. He observed that
 This bill deals with insuring that the statute of limitations does not run against somebody before they even find out that they have a right to be indemnified. A recent court decision came down which indicated that that may be the case, and this is a clarification of the current law, Madam Speaker.
36 H.R. Proc., Pt. 31, 1993 Sess., p. 11006.
When a bill is introduced to clarify existing law, it is presumed to be immediately applicable to all actions then pending CT Page 6440 and all liability that may then be asserted. Hartford v.Suffield, 137 Conn. 341, 346 (1950). This is so because the clarification of a statute is deemed to embody the original intent of the legislature, as it should have been understood and applied by the courts ab initio, not some new intent which presumptively applies only prospectively. Darak v. Darak,210 Conn. 462, 471 (1989).
Looking to the Protter decision itself, one finds that in the absence of Connecticut's date-of-injury statutes of limitations, the court would have enforced the common-law rule concerning indemnification actions. Under that rule,
 Statutes of limitations did not begin to run until the accrual of an action, and an action for indemnification did not accrue until the entry of final judgment against the party seeking indemnification.
Protter v. Brown Thompson Co., supra, 364. By clarifying its intent as to the substantive reach of its general tort and negligence statutes of limitations, General Statutes §§ 52-577
and 52-584, and eliminating from the scope of those statutes any indemnification actions founded upon a tort, the legislature signalled its intent to revert to the time-honored common-law rule, and thus to assess the timeliness of such actions measuring from the date of accrual, not from the date of the underlying injury.
Against this background, it is apparent that the legislature's purpose and intent in using the words "action," "judgment" and "settlement" in the new statute was not to restrict the "new," more relaxed statute of limitations to certain limited types of indemnification actions. Instead, it was to restore the common-law rule governing the timeliness of such actions to Connecticut law. There is no evidence whatsoever in the legislative history of any contrary purpose.
On this score, it must be noted that although some courts, speaking loosely, have said that indemnification rights do not accrue until a final judgment has entered; see, e.g., McEvoy v.Waterbury, supra, 667; Protter v. Brown Thompson Co., supra, 364; that has never actually been the case. Thus in Wolthausen v.Trippert, supra, and Smith v. Foran, supra, the right in question accrued upon payment, not judgment. In the latter case, in CT Page 6441 particular, the payment was made in response to a valid claim that had never been put in suit. The upshot of those cases is that here, as in other American States, indemnification rights accrue either when a judgment requiring payment enters against the indemnitee or when the indemnitee pays a claim which he could have been compelled at law to pay. 42 C.J.S., Indemnity § 45, p. 140. ("[W]here a person is confronted with an obligation that he cannot legally resist, the fact of voluntary payment does not negative the right to indemnity, as he is not obligated to wait to be sued or to lose reasonable opportunity for compromise.") By declaring that, "Notwithstanding a provision of this chapter, an action for indemnification may be brought within three years from the date of the determination of the action against the party which is seeking indemnification by either judgment or settlement," General Statutes § 52-598a, the legislature plainly sought to eradicate any pre-existing notion that anything in the general tort or negligence statutes of limitations governed indemnification actions. If those statutes did not apply to indemnification claims arising in the context of litigation, they surely did not apply to such actions if they arose in advance of litigation. The passage of the statute thus does not leave Protter a viable precedent as to any type of indemnification claim. Instead, it overturned that decision as to all such claims, however they arose. Under this reading of the statute, the phrase "determin[ation] . . . by . . . settlement" must be read broadly to include determination by payment under a valid claim of right. Here, since the plaintiff's payment was made under those very circumstances, it is entitled to maintain the instant action, which was timely brought less than three years after its indemnification claim accrued by the payment of a valid claim for reimbursement under the subject title insurance policy.
For all of the foregoing reasons, the defendant's motion for summary judgment is hereby denied.
SHELDON, J.